IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-91

No. 446A20

Filed 27 August 2021

IN THE MATTER OF: A.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 13 July 2020 by Judge Marion M. Boone in District Court, Stokes County. This matter was calendared for argument in the Supreme Court on 21 June 2021, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Jennifer Oakley Michaud for petitioner-appellee Stokes County Department of Social Services.*
>
> *James N. Freeman, Jr., for appellee Guardian ad Litem.*
>
> *Jeffrey L. Miller for respondent-appellant mother.*

ERVIN, Justice.

¶ 1 Respondent-mother Krissy M. appeals from the trial court's orders terminating her parental rights in A.C.[1] After careful review of the trial court's termination orders in light of the record and the applicable law, we conclude that those orders should be affirmed.

---

[1] A.C. will be referred to throughout the remainder of this opinion as "Arty," which is a pseudonym used for ease of reading and to protect the juvenile's privacy.

On 13 July 2018, the Stokes County Department of Social Services filed a petition alleging that Arty was a neglected juvenile. In its petition, DSS alleged that it had received a child protective services report on 29 June 2018 stating that Arty, who had just been born, was in the neonatal intensive care unit as the result of possible drug exposure and respiratory distress. According to DSS, respondent-mother had admitted to having taken Subutex, which she purchased "off the street," and was suffering from withdrawal symptoms that included being "jittery[,] [s]haky, [and] sweaty." After expressing concern that respondent-mother "may be using something else now," DSS stated that she was "taking Subutex in the hospital and it[']s now prescribed by a doctor." Although a drug test that respondent-mother had taken while hospitalized had produced negative results, DSS asserted that Arty's umbilical cord had tested positive for the presence of amphetamines and Subutex at the time of his birth. DSS further alleged that respondent-mother had told social workers "that she had been getting Subutex off the street for the last four years due to her 'getting hooked' on pain medication after a car accident" and that she had been taking Adderall to help with her depression despite the fact that she did not have a prescription authorizing her to use that substance. On the same date upon which the petition was filed, DSS obtained the entry of an order providing that Arty should be taken into nonsecure custody.

After a hearing held on 27 September 2018, Judge Gretchen H. Kirkman, with respondent-mother's consent, entered an order on 30 October 2018 determining that Arty was a neglected juvenile. On 30 October 2018, Judge Kirkman entered a separate dispositional order providing that Arty would remain in DSS custody and establishing a primary permanent plan for Arty of reunification with a parent and a concurrent permanent plan of guardianship. In addition, Judge Kirkman ordered that respondent-mother enter into a Family Services Case Plan and comply with its provisions. Finally, Judge Kirkman authorized respondent-mother to have four hours of supervised visitation with Arty each week on the condition that she provide negative drug screens.

After a review hearing held on 28 March 2019, Judge Thomas Langan entered an order on 10 May 2019 in which he found that respondent-mother was living with her own mother, that she was struggling with anxiety and depression, that these mental health difficulties were interfering with her efforts to satisfy the requirements of her case plan, that she had not been attending parenting classes or receiving mental health treatment since December 2018, and that she had not had a domestic violence assessment. As a result, Judge Langan ordered respondent-mother to comply with the requirements of her case plan and to cooperate with the drug screening process.

¶ 5 In the aftermath of a review hearing held on 8 August 2019, the trial court entered a permanency-planning order on 10 September 2019 in which it found that respondent-mother continued to live with her mother, continued to struggle with anxiety and depression, and had not attended parenting classes or mental health treatment since December 2018 until restarting treatment in May 2019. In addition, the trial court found that respondent-mother had refused to participate in the drug screening process, had failed to appear for the purpose of providing a sample to be screened in December and January, had not been screened for drugs from December 2018 through 22 March 2019, had failed to appear for a scheduled drug screen on 10 June 2019, and had admitted to having taken Adderall that was purchased unlawfully. The trial court further found that respondent-mother had failed to participate in a second psychological evaluation that she had been ordered to obtain after reporting that she had ceased making any effort to satisfy the requirements of her case plan as the result of anxiety and depression. Moreover, the trial court also found that respondent-mother had reported that she had been involved in an incident of domestic violence during which Arty's father had become violent and which had led her to obtain the entry of a domestic violence protective order against Arty's father. Finally, the trial court found that respondent-mother had failed to demonstrate that she was employed. As a result, the trial court changed Arty's primary permanent plan to one of adoption.

¶ 6        Following a permanency-planning hearing held on 10 October 2019, the trial court entered an order on 7 November 2019 determining that respondent-mother was obtaining housing with Arty's father, had completed a domestic violence support group, had completed parenting classes, and had obtained a psychological evaluation. On the other hand, the trial court also found that respondent-mother continued to either refuse to participate in the drug screening process or to fail to appear upon occasions when she was requested to provide a sample for screening and that she had tested positive for the presence of Subutex and methamphetamines on 4 September 2019. In addition, the trial court found that respondent-mother had failed to attend Arty's medical appointments.

¶ 7        On 7 November 2019, DSS filed a motion seeking to have respondent-mother's parental rights in Arty terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1) (2019); willful failure to make reasonable progress toward correcting the conditions that had led to Arty's removal from her care, N.C.G.S. § 7B-1111(a)(2); and dependency, N.C.G.S. § 7B-1111(a)(6). On 13 July 2020, the trial court entered an adjudicatory order determining that respondent-mother's parental rights in Arty were subject to termination on the basis of all three grounds for termination alleged in the termination motion and a separate dispositional order determining that the termination of respondent-mother's parental rights would be in Arty's best interests.

As a result, the trial court terminated respondent-mother's parental rights in Arty.[2] Respondent-mother noted an appeal to this Court from the trial court's termination orders.[3]

As an initial matter, respondent-mother contends that the trial court erred by determining that her parental rights in Arty were subject to termination. A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" that one or more of the grounds for termination set out in N.C.G.S. § 7B-1111(a) exist. N.C.G.S. § 7B-1109(f). We review a trial court's adjudication decision in order "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111 (citing *In re Moore*, 306 N.C. 394, 404 (1982)). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is

---

[2] Although the trial court terminated the parental rights of Arty's father as well, he did not note an appeal from the trial court's termination orders and is not a party to the proceedings before this Court.

[3] The notice of appeal that respondent-mother filed in this case was directed to the Court of Appeals rather than this Court. In view of the seriousness of the consequences of the trial court's orders for both respondent-mother and Arty and the fact that neither DSS nor the guardian ad litem have objected to the sufficiency of respondent-mother's notice of appeal, we elect to treat the record on appeal as a certiorari petition and allow that petition in order to reach the merits of respondent-mother's challenge to the lawfulness of the trial court's termination orders. *Anderson v. Hollifield*, 345 N.C. 480, 482 (1997).

sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019).

A parent's parental rights in a child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that the trial court concludes that the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). As we have recently explained,

> [t]ermination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up) (first quoting *In re D.L.W.*, 368 N.C. 835, 843 (2016); then quoting *In re Z.V.A.*, 373 N.C. 207, 212 (2019).

In determining that respondent-mother's parental rights in Arty were subject to termination on the basis of neglect, the trial court took judicial notice of the file in the underlying juvenile neglect and dependency proceeding and found that Arty had been adjudicated to be a neglected juvenile on 27 September 2018. In addition, the

trial court found that respondent-mother had agreed to a case plan on 19 September 2018 that required her to (1) attend and successfully complete an approved parenting class; (2) complete a parenting psychological evaluation, a mental health evaluation, a domestic violence assessment, and a substance abuse assessment and comply with all treatment-related recommendations; (3) participate in a random drug screening process; (4) communicate with DSS on a weekly basis; (5) maintain a legal and stable source of income for a period of at least three months; and (6) obtain and maintain stable housing for a period of at least three months. Although the trial court did find that respondent-mother had made some progress toward satisfying the requirements of her case plan, it also found, however:

> 36. That [respondent-mother] stated to Dr. Schaeffer during her psychological evaluation that she had broken up with the father and that she didn't understand why he was listed as an aggressor in a report.
>
> . . . .
>
> 38. That [respondent-mother] appears to have "broken up" with the father at least three different times throughout the time [Arty] has been in the care of Stokes DSS.
>
> . . . .
>
> 42. That [respondent-mother] did not appear concerned that the father had not completed any domestic violence counseling.
>
> . . . .

45. That although [respondent-mother] denie[d] drug use, the drug screens presented as Respondent's Exhibit 2 still list that [respondent-mother] is diagnosed with severe opioid use disorder.

. . . .

48. That [respondent-mother] began Mental Health services with The Neill Group two weeks after the Adjudication Hearing in this matter began on March 13th, 2020.

49. That the Court has not heard any evidence regarding any additional Mental Health or Domestic Violence counseling since the last [incidents] of Domestic Violence.

. . . .

54. That although [respondent-mother] states that she does not have a relationship with the father, it is extremely troubling to this Court that the mother is in continued contact with the father and is allowing visitation with her new baby.

. . . .

56. That the Court finds that [respondent-mother] has genuine love and affection for [Arty], but that she does not appear to grasp the severity of the issues after all of the court hearings and all of the therapy that [she] has engaged in.

57. That [respondent-mother] minimizes her role in the issues leading up to today's hearing and what she needs to do to prevent problems of the past.

58. That even during [respondent-mother's] psychological evaluations the evaluators noted that [she]

minimized issues and did not grasp why this was happening to her.

59. That Dr. Bennett specifically stated in [respondent-mother's] psychological evaluation that [respondent-mother] had minimized her mental health and substance abuse issues.

. . . .

65. That prior to March 13th, 2020, [respondent-mother] had missed approximately three months of visitation with [Arty].

. . . .

70. That the juvenile is a neglected juvenile, and that there is a reasonable likelihood of such neglect continuing in[to] the future. More specifically:

. . . .

    b.   [Respondent-mother] . . . ha[s] failed to show conditions were remedied since the time of removal of the juvenile and therefore it appears likely that such neglect would continue into the foreseeable future.

"Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019).

¶ 11     As an initial matter, we consider respondent-mother's contention that many of the findings of fact contained in the trial court's adjudication order should be disregarded because they are nothing more than recitations of the testimony provided by various witnesses. According to well-established North Carolina law,

"[r]ecitations of the testimony of each witness *do not* constitute *findings of fact* by the trial judge." *In re N.D.A.*, 373 N.C. 71, 75 (2019) (alteration in original) (*quoting Moore v. Moore*, 160 N.C. App. 569, 571–72 (2003)). In *In re N.D.A.*, the trial court found as a fact that the father had "*testified* that he had 'attempted to set up visits with the child but could not get any assistance in doing so.'" *Id.* (emphasis added). On appeal, the father argued that the quoted language did not constitute a valid finding of fact because it contained nothing more than a recitation of his own testimony, a contention with which this Court agreed given that the language in question failed to determine whether the relevant portion of the father's testimony was credible. *Id.* As a result, this Court disregarded the language in question in determining the validity of the trial court's termination order. *Id.*

¶ 12 A careful review of the trial court's adjudication order satisfies us that Finding of Fact Nos. 33, 35, 37, 39–41, 43–44, 46–47, 50–53, and 55 are nothing more than recitations of the testimony of various witnesses. Each of these findings states that a witness either "testified," "contends," or "indicated" that something was true. In light of the fact that, in the relevant findings of fact, the trial court simply recited the testimony of various witnesses rather than indicating what actually happened or describing a statement that might constitute an admission by a party or otherwise had relevance because that statement was actually made, these "findings" fail to satisfy the trial court's obligation to evaluate the credibility of the witnesses who

testified at the adjudication hearing and to resolve any contradictions that existed in the evidence. As a result, our precedent compels us to disregard these findings of fact in ascertaining whether the trial court did or did not err in determining that respondent-mother's parental rights in Arty were subject to termination on the basis of neglect.

In addition to the findings of fact listed above, respondent-mother contends that Finding of Fact Nos. 54 and 59 should also be disregarded as mere recitations of witness testimony. However, we are not persuaded by respondent-mother's contentions with respect to these findings of fact.

In Finding of Fact No. 54, the trial court stated that, "although [respondent-mother] states that she does not have a relationship with the father, it is extremely troubling to this Court that the mother is in continued contact with the father and is allowing visitation with her new baby." Admittedly, the trial court did point out that respondent-mother had "state[d]" that she was no longer in a relationship with the father. In addition, however, the trial court determined in Finding of Fact No. 54 (1) that respondent-mother continued to have contact with the father and allowed him to have visitation with her new baby and (2) that her conduct in this regard was "extremely troubling" to the trial court. In our view, both of these statements constitute actual findings of fact rather than simple recitations of witness testimony. *See In re Harris Teeter, LLC*, 271 N.C. App. 589, 611 (stating that "[a] finding of fact

is a 'determination reached through logical reasoning from the evidentiary facts' ")
(quoting *Barnette v. Lowe's Home Ctrs., Inc.*, 247 N.C. App. 1, 6 (2016))), *cert. denied*,
376 N.C. 544 (2020), *and aff'd on other grounds*, 2021-NCSC-80. As a result, the
information contained in Finding of Fact No. 54 relating to respondent-mother's
continued contact with Arty's father, her decision to allow Arty's father to visit with
her new baby, and the trial court's concern about her conduct is appropriately
considered in determining whether respondent-mother's testimony was credible and
whether respondent-mother's parental rights in Arty were subject to termination on
the basis of neglect.

¶ 15        A careful reading of the trial court's termination order persuades us that
Finding of Fact No. 59 must be read in conjunction with Finding of Fact 58, which
states "[t]hat[,] even during [respondent-mother's] psychological evaluations[,] the
evaluators noted that [respondent-mother] minimized issues and did not grasp why
this was happening to her." In stating in Finding of Fact No. 59 "[t]hat Dr. Bennett
specifically stated in [respondent-mother's] psychological evaluation that
[respondent-mother] had minimized her mental health and substance abuse issues,"
the trial court was simply pointing to the portion of the record that provided the
evidentiary support for Finding of Fact No. 58. As a result, we decline to disregard
the essential import of Finding of Fact Nos. 58 and 59, which is that respondent-

mother tended to minimize the nature and extent of the difficulties that she faced in attempting to parent Arty.

¶ 16    In addition, respondent-mother attacks the validity of the finding in which the trial court judicially noticed the materials in the underlying neglect and dependency action and incorporated the "file and any findings of fact therefrom within the current order." In support of this contention, respondent-mother points out that "[t]he trial court made broad, general statements of judicial notice and incorporation without specifying precisely what it was using for any specific finding" and argues that "[m]erely incorporating documents by reference is not a sufficient finding of fact." We do not believe that the presence of this language in the trial court's adjudication order constitutes prejudicial error.

¶ 17    As an initial matter, we note that respondent-mother did not object to the trial court's decision to judicially notice the file in the underlying neglect and dependency proceeding. *See In re A.B.*, 272 N.C. App. 13, 16 (2020) (stating that "[a] respondent's failure to object to the trial court's taking judicial notice of the underlying juvenile case files waives appellate review of the issue" (cleaned up) (quoting *In re W.L.M.*, 181 N.C. App. 518, 522 (2007))). In addition, even if respondent-mother had properly preserved her objection to the trial court's decision to judicially notice the materials in the underlying neglect and dependency proceeding for purposes of appellate review, her objection to the trial court's action lacks substantive merit. As this Court

has previously recognized, "[a] trial court may take judicial notice of findings of fact made in prior orders, even when those findings are based on a lower evidentiary standard because where a judge sits without a jury, the trial court is presumed to have disregarded any incompetent evidence and relied upon the competent evidence." *In re T.N.H.*, 372 N.C. at 410 (citing *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981)). On the other hand, however, "the trial court may not rely solely on prior court orders and reports" and must, instead, "receive some oral testimony at the hearing and make an independent determination regarding the evidence presented." *Id.*

¶ 18       Although the trial court did take judicial notice of the record in the underlying neglect and dependency proceeding and incorporated "that file and any findings of fact therefrom within the [adjudication] order," it did not rely solely upon these materials in determining that respondent-mother's parental rights in Arty were subject to termination. Instead, the trial court also received oral testimony during the termination hearing from Katie Fulk, a social worker; respondent-mother; and Jodi Callahan, an addiction specialist employed by Novant Health, who counseled respondent-mother regarding her substance abuse issues. In addition, the trial court made independent factual determinations based upon the evidence admitted at the termination hearing that adequately addressed the matters at issue between the parties. As a result, since the trial court received evidence in the form of oral witness

testimony at the adjudication hearing, fully considered this evidence, and made findings of fact delineating its independent evaluation of the record evidence in its adjudication order, we conclude that respondent-mother's challenge to the trial court's decision to take judicial notice of the record developed in the underlying neglect and dependency proceeding lacks merit.

¶ 19        Next, respondent-mother challenges the appropriateness of Finding of Fact Nos. 36 and 38 on the grounds that they lack "a nexus, an anchor in time, or relevance as support for a conclusion on the existence of any ground at the time of the hearing." According to respondent-mother, in light of the trial court's failure to "articulat[e] the connection between a finding and a ground, many [of its] findings are simply statements with no support for a ground for termination." Once again, we fail to find respondent-mother's argument to be persuasive.

¶ 20        As an initial matter, we hold that both of the challenged findings of fact have ample evidentiary support. In Finding of Fact No. 36, the trial court stated that respondent-mother had told "Dr. Schaeffer during her psychological evaluation that she had broken up with the father and that she didn't understand why he was listed as an aggressor in a report." As the record reflects, respondent-mother acknowledged that DSS had expressed concern about her relationship with Arty's father and that she had told Dr. Schaeffer that Arty's father had a "bad temper" before stating that she did not "know why" Arty's father had been described as an "aggressor" in various

reports. In Finding of Fact No. 38, the trial court found that respondent-mother "appears to have 'broken up' with the father at least three different times throughout the time the juvenile has been in" DSS care. According to the record, respondent-mother testified that she had "broke[n] up" with Arty's father right after Christmas in 2019, after previously having ended her relationship with him one year earlier. In addition, the record reflects that respondent-mother admitted that, in April 2019, Arty's father had intimidated her; that she had locked herself in a bathroom in response to his conduct; and that, after she had done so, Arty's father broke down the door and forced his way into the bathroom, causing her to obtain the entry of a domestic violence protective order against him. As a result, the relevant findings of fact are supported by clear, cogent, and convincing record evidence and appear to us to have been relevant to the issue of whether respondent-mother's parental rights in Arty were subject to termination on the basis of neglect given that they demonstrated the continued existence of contact between respondent-mother and Arty's father despite his abusive behavior, a fact that tends to show her failure to understand and to address the issue of domestic violence.

¶ 21        Similarly, respondent-mother challenges a number of other findings as lacking in sufficient record support. First, respondent-mother argues that the record fails to provide sufficient support for Finding of Fact No. 42, in which the trial court found that respondent-mother "did not appear concerned that the father had not completed

any domestic violence counselling." The record contains ample support for an assertion that respondent-mother and Arty's father had a history of domestic violence. At the termination hearing, respondent-mother testified that, during the first year of her relationship with Arty's father and while she was pregnant with Arty, she "started noticing that he might have like some anger issues, . . . but I stayed with him in a chance to make our family work. He's gotten worse over the time." In addition, as we have already noted, respondent-mother had reported an incident of domestic violence between herself and Arty's father that had occurred in April 2019 and that had (1) caused Arty's father to go on "a three-day high, which led to his being violent" and had (2) motivated respondent-mother to obtain the entry of a domestic violence protective order directed against Arty's father. In spite of this history of domestic violence, however, respondent-mother subsequently reconciled with Arty's father. At a permanency-planning hearing held on 10 October 2019, respondent-mother reported that she had established housing with Arty's father in Winston-Salem. In addition, respondent-mother acknowledged at the termination hearing that she continued to allow the father to visit with her new baby. When asked at the termination hearing whether, as a victim of domestic violence, she had concerns about the fact that Arty's father was having visits with her child, respondent-mother testified that her "only concern" was Arty's father's "substance abuse problems." As a result, the record contains ample support for Finding of Fact No. 42. *See In re*

*D.L.W.*, 368 N.C. at 843 (stating that the trial judge is required to consider all of the evidence, to pass upon the credibility of the witnesses, and to determine the reasonable inferences to be drawn from the evidence).

¶ 22          In addition, respondent-mother challenges the sufficiency of the record support for Finding of Fact No. 45, which states that, "although [respondent-mother] denies drug use, the drug screens presented as Respondent's Exhibit 2 still list that the mother is diagnosed with severe opioid use disorder." In support of this contention, respondent-mother states that, since her drug screen results demonstrate that she had not engaged in improper drug use since July 2018, the fact that the drug screen summaries that were admitted into evidence at the termination hearing continued to "list" a diagnosis of severe opioid use disorder constitutes a misrepresentation of the evidence by implying that she has a new or ongoing substance abuse or disorder.

¶ 23          As the trial court's findings reflect, the drug screen summaries indicate that, throughout the relevant period of time, respondent-mother was diagnosed as having an "[o]pioid use disorder, severe." For that reason, the specific finding that the trial court actually made has sufficient evidentiary support. *In re D.L.W.*, 368 N.C. at 843. On the other hand, given the absence of any evidence tending to show what, if anything, the continued existence of this diagnosis reflects and what was necessary in order for this diagnosis to be deleted and the absence of any findings that respondent-mother had tested positive for the presence of unlawful drugs or exhibited

a consistent pattern of attempting to evade the required drug screening process in the period of time immediately prior to the termination hearing, we opt to refrain from considering Finding of Fact No. 45 in determining whether the trial court's findings support its conclusion that respondent-mother's parental rights in Arty were subject to termination on the basis of neglect. *See In re N.G.*, 374 N.C. 891, 900 (stating that this Court limits its review of findings of fact "to those challenged findings that are necessary to support the trial court's determination . . . that parental rights should be terminated").

¶ 24        Next, respondent-mother challenges the sufficiency of the record support for Finding of Fact No. 49, which states that "the Court has not heard any evidence regarding any additional Mental Health or Domestic Violence counseling since the last [incidents] of Domestic Violence." Although respondent-mother testified at the termination hearing that the last incident of domestic violence in which she was involved with Arty's father had occurred in April 2019, she also claims that, after this date, she had continued to participate in substance abuse counseling at Novant Health, had attended mental health treatment at Novant Health and the Neill Group, and had participated in group sessions that were intended to address domestic violence concerns. A careful review of the record satisfies us that respondent-mother did, in fact, receive mental health counseling at Novant Health after April 2019, with the Novant Health records that were admitted into evidence as Respondent's Exhibit

tending to show that respondent-mother saw a physician for treatment of major depressive disorder and panic disorder on 16 May 2019 and that she saw a provider at Novant Health for "[d]epression affecting pregnancy" on 3 October 2019. In addition, DSS concedes that respondent-mother sought domestic violence counseling after April 2019 given that the record contains a certificate of participation dated 9 October 2019 that shows that respondent-mother completed a domestic violence support group.[4] As a result, we will disregard Finding of Fact No. 49 in evaluating the lawfulness of the trial court's determination that respondent-mother's parental rights in Arty were subject to termination on the basis of neglect. *In re S.M.*, 375 N.C. 673, 684 (2020).

¶ 25 Moreover, respondent-mother argues that Finding of Fact Nos. 57 through 59, which indicate that respondent-mother failed to "grasp" and tended to minimize the extent of her involvement in the difficulties that precluded her reunification with Arty, lack sufficient record support. Respondent-mother's argument to the contrary notwithstanding, however, the record reflects that Dr. Bennett specifically stated in his report that respondent-mother "minimized emotional and psychiatric issues";

---

[4] DSS contends that, "given that the parents reconciled and separated again by December of 2019, it is not beyond imagining that further instances of domestic violence likely occurred around that time." Although the trial court does have the right to make reasonable inferences from the evidence, "[s]uch inferences, however, 'cannot rest on conjecture or surmise.'" *In re K.L.T.*, 374 N.C. 826, 843 (2020) (quoting *Sowers v. Marley*, 235 N.C. 607, 609 (1952)). The inference that DSS seeks to have us draw from the parents' reconciliation and subsequent separation does not strike us as a reasonable one.

that this tendency to minimize the problems that respondent-mother faced "extend[ed] to the potential for domestic violence as she does not appear to understand that the [April 2019] incident . . . would be considered domestic violence"; and that respondent-mother tended to minimize her substance abuse problems. Although respondent-mother points out that Dr. Bennett's report was the only evidence upon which these findings could possibly rest, the report in question provides ample support for the challenged portions of Finding of Fact Nos. 57 through 59, with it being the province of the trial court to evaluate the credibility of the evidence and to determine the reasonableness of the inferences that should be drawn from that evidence. *In re D.L.W.*, 368 N.C. at 843. Thus, we reject this aspect of respondent-mother's challenge to the lawfulness of the trial court's order.

Furthermore, respondent-mother contends that Finding of Fact No. 65, in which the trial court stated that, "[p]rior to March 13th 2020, [respondent-mother] had missed approximately three months of visitation with [Arty]," fails "to account for those reasonable and excusable justifications consistent with the missed visits." Respondent-mother does not, however, argue that she did not miss the visits in question. In addition, the trial court has the authority, in the exercise of its responsibility as the finder of fact, to refrain from accepting any justifications or explanations that respondent-mother offered for missing these visits. *See In re J.T.C.*, 273 N.C App. 66, 70 (2020) (stating that "[i]t is well-established . . . that

'[c]redibility, contradictions, and discrepancies in the evidence are matters to be resolved by the trier of fact, here the trial judge, and the trier of fact may accept or reject the testimony of any witness' " (second alteration in original) (quoting *Smith v. Smith*, 89 N.C. App. 232, 235 (1988)), *aff'd per curiam*, 376 N.C. 642 (2021). As a result, the trial court did not commit any error of law in making Finding of Fact No. 65.

¶ 27    In Finding of Fact No. 71, the trial court stated that the allegations set out in the termination motion had "been proven by clear, cogent, and convincing evidence." Although respondent-mother appears to contend that the trial court erred by making Finding of Fact No. 71 on the grounds that this finding involves an erroneous application of the legal principles governing the issue of judicial notice, the challenged finding of fact is nothing more than a statement of the applicable standard of proof. *See* N.C.G.S. § 7B-1109(f) (providing that, at the adjudicatory portion of a termination of parental rights proceeding, "[t]he burden . . . shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence"); s*ee also In re B.L.H.*, 376 N.C. 118, 127 (2020) (holding that, while the trial court failed to state the required standard of proof in the written termination order, its oral statement that its findings rested upon "clear, cogent, and convincing" evidence satisfied the requirements of N.C.G.S. § 7B-1109(f)).

¶ 28        Similarly, in Finding of Fact No. 72, the trial court stated that "any additional allegations of the Motion for Termination of Parental Rights not specifically laid out [in its previous findings were incorporated into its adjudicatory order] as Findings of Fact." According to respondent-mother, the trial court erred by making this finding of fact on the theory that the trial court is required to find the facts specifically rather than simply incorporating a large body of findings from some other document by reference and on the grounds that a trial court cannot make adequate findings of fact by simply reciting the allegations set out in a termination motion. *See In re Harton*, 156 N.C. App. 655, 660 (2003) (stating that, "[w]hen a trial court is required to make findings of fact, it must make the findings of fact specially" and, instead of "simply recit[ing] allegations," "must through processes of logical reasoning from the evidentiary facts find the ultimate facts essential to support the conclusions of law" (cleaned up) (first quoting N.C.G.S. § 1A-1, Rule 52(a)(1) (2001); then quoting *In re Anderson*, 151 N.C. App. 94, 96 (2002))). We do not find respondent-mother's argument to be persuasive.

¶ 29        As this Court has previously stated, "[t]he requirement for appropriately detailed findings is . . . not a mere formality or a rule of empty ritual; it is designed instead 'to dispose of the issues raised by the pleadings and to allow the appellate courts to perform their proper function in the judicial system.' " *Coble v. Coble*, 300 N.C. 708, 712 (1980) (quoting *Montgomery v. Montgomery*, 32 N.C. App. 154, 158

(1977)). A careful review of the trial court's adjudication order reveals that, rather than simply reciting the allegations set out in the termination motion, the trial court made "sufficient additional findings of fact which indicate the trial court considered the evidence presented at the hearing," *In re S.C.R.*, 217 N.C. App. 166, 169 (2011) (quoting *In re O.W.*, 164 N.C. App. 699, 702 (2004)), with this case being readily distinguishable from *In re S.C.R.*, in which the trial court erroneously made only "one additional finding of fact beyond those incorporated from the petition," resulting in the entry of an order that was, as the Court of Appeals determined, insufficient to permit a "determin[ation] that the judgment is adequately supported by competent evidence." *Id.* at 170 (quoting *Montgomery*, 32 N.C. App. at 156–57). Instead, the trial court made over seventy findings of fact in the adjudication order that is at issue in this case. Even though, as we have already noted, a number of the trial court's findings were deficient for various reasons, the remaining findings are sufficient to permit meaningful appellate review. *Cf. In re K.R.C.*, 374 N.C. 849, 861 (2020) (concluding that this Court was "simply unable to undertake meaningful appellate review of the trial court's decision based upon a series of evidentiary findings which [were] untethered to any ultimate facts which undergird an adjudication pursuant to N.C.G.S. § 7B-1111(a) or to any particularized conclusions of law which would otherwise explain the trial court's reasoning"). *See also In re Z.D.*, 258 N.C. App. 441, 444 (2018) (stating that, in order for an appellate court to conduct a meaningful

review, a "trial court must make *specific findings* of the ultimate facts established by the evidence, admissions and stipulations which are determinative of the questions involved in the action and essential to support the conclusions of law reached" (internal quotation marks omitted) (quoting *Quick v. Quick*, 305 N.C. 446, 452 (1982))); *In re A.B.*, 245 N.C. App. 35, 44–45 (2016) (stating that, "[a]lthough finding of fact 13 certainly includes some 'unoriginal prose [,]' . . . the trial court made 70 findings of fact" and "referred to the allegations from DSS's petitions by reference to subparagraphs a-k in one of seventy findings, so it is clear that the trial court made an independent determination of the facts and did 'more' than merely 'recit[e] the allegations' " (second and fourth alterations in original) (quoting *In re O.W.*, 164 N.C. App. at 702)). As a result, we reject respondent-mother's contention that the trial court erred by incorporating the allegations set out in the termination motion in its termination order.

¶ 30    Next, respondent-mother argues that Finding of Fact No. 70(b), which states that respondent-mother had "failed to show conditions were remedied since the time of removal of the juvenile and therefore it appears likely that such neglect would continue into the foreseeable future" improperly shifted the burden of proof from DSS to respondent-mother by requiring her to "show conditions" had been "remedied" since Arty had been removed from her home. Although respondent-mother is certainly correct in noting that the burden of proof at the adjudication stage of a

termination of parental rights proceeding rests upon the petitioner or movant, *see* N.C.G.S. § 7B-1109(f) (stating that "[t]he burden in [an adjudicatory hearing on termination] shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence"), we do not believe that Finding of Fact No. 70(b) indicates that the trial court impermissibly shifted the burden of proof from DSS to respondent-mother. Instead, we conclude that, "[w]hen viewed in the context of the entire termination order, the trial court's finding is merely an expression of its observation that respondent-mother failed to rebut petitioners' clear, cogent, and convincing evidence that the conditions of [removal had not been remedied]," *In re D.L.A.D.*, 375 N.C. 565, 570 (2020); *see also In re A.R.A.*, 373 N.C. 190, 196 (2019) (stating that "the district court did not improperly shift DSS' burden of proof onto respondent-mother" and had, instead, "simply observed that respondent-mother had failed to rebut DSS' clear, cogent, and convincing evidence that she and the father had not established safe and stable housing for the children"), when viewed in light of its earlier determinations that respondent-mother failed to fully grasp the extent of her mental health problems and the difficulties created by her continued relationship with Arty's father.[5] As a result, we hold that this aspect of respondent-mother's challenge to the trial court's adjudication order has no merit.

---

[5] Although respondent-mother challenges the lawfulness of Finding of Fact Nos. 41, 60, 61, and 68 as well, we need not address the arguments that she advanced in support of her contention that the trial court erred by making these findings on the grounds that the

¶ 31 Finally, respondent-mother asserts that the record evidence and the trial court's findings of fact fail to support its determination that it was likely that Arty would be neglected in the event that he was returned to respondent-mother's care. We are unable to agree with respondent-mother's contention.

¶ 32 As we have already noted, the trial court erred by making a number of findings of fact that constituted nothing more than recitations of the testimony of various witnesses and by finding, in the absence of sufficient record support, that the record did not contain any indication that respondent-mother had participated in any mental health or domestic violence treatment after the April 2019 incident in which Arty's father committed acts of domestic violence against her. However, "[t]here is nothing impermissible about describing testimony, so long as the court ultimately makes its own findings, resolving any material disputes," *In re T.N.H.*, 372 N.C. at 408 (quoting *In re C.L.C.*, 171 N.C. App. 438, 446 (2005), *aff'd per curiam, in part, and disc. rev. improvidently allowed, in part*, 360 N.C. 475 (2006)), and this Court simply disregards information contained in findings of fact that lack sufficient evidentiary support in determining whether the trial court's findings of fact support a determination that a parent's parental rights in a child are subject to termination. As a result, we will now examine the sufficiency of the trial court's properly made and

findings in question are not necessary to support a conclusion that the trial court's findings support its conclusion that respondent-mother's parental rights were subject to termination on the basis of neglect. *See In re N.G.*, 374 N.C. at 900.

supported findings of fact for the purpose of ascertaining whether they support a determination that respondent-mother's parental rights in Arty were subject to termination on the basis of neglect, including whether those findings sufficed to show a likelihood of future neglect in the event that Arty was to be returned to respondent-mother's care.

¶ 33 A careful review of the trial court's valid findings of fact establishes that, while respondent-mother made some progress in satisfying the requirements of her case plan, the progress that she did make was extremely limited; that respondent-mother had "broken up" with the father on at least three occasions during the pendency of the underlying neglect and dependency proceeding; that, in spite of her denial that she was still involved in a romantic relationship with Arty's father, respondent-mother continued to have contact with Arty's father and allowed him to visit her new baby; that respondent-mother was not concerned by the fact that Arty's father had failed to complete domestic violence counseling; that, in spite of the fact that respondent-mother had genuine love and affection for Arty, she did not grasp the severity of the difficulties that she faced in seeking to be reunited with him; that respondent-mother minimized the problems that she faced and the significance of the steps that she needed to take in order to prevent these past difficulties from recurring; that respondent-mother was completely dependent upon others for her housing and finances; that respondent-mother had never had stable housing or independent

means of support during the pendency of the underlying neglect and dependency proceeding; that respondent-mother missed approximately three months of visitation with Arty; and that respondent-mother had failed to provide any financial support for Arty during the time that he was in DSS custody. In addition, the trial court found that Arty had been adjudicated to be a neglected juvenile in 2018; that respondent-mother had failed to show that the conditions that had led to Arty's removal from her care had been remedied; and that there was a likelihood that the neglect that Arty had experienced would recur in the event that he was returned to respondent-mother's care.

¶ 34      The trial court's properly made findings indicate that Arty had previously been found to be a neglected juvenile. In addition, by finding as a fact that respondent-mother had made some progress toward satisfying the requirements of her case plan by submitting to psychological evaluations, completing parenting classes, obtaining a domestic violence assessment and completing domestic violence classes, maintaining some level of contact with DSS, participating in substance abuse treatment, participating in a number of drug screens, and submitting to a mental health evaluation, it is apparent that the trial court considered whether respondent-mother's situation had improved between the date upon which Arty entered DSS custody and the date of the termination hearing. *In re Z.V.A.*, 373 N.C. at 212. On the other hand, the trial court also found that future neglect was likely in the event

that Arty was returned to respondent-mother's care. In reaching this conclusion, the trial court focused upon the fact that respondent-mother minimized the severity of her parenting-related problems and the extent to which her parenting deficiencies had contributed to Arty's removal from her care, with the trial court having expressed particular concern about the fact that respondent-mother continued to have contact with Arty's father, had reconciled with him on more than one occasion, and was allowing him to visit her new child in spite of his prior history of committing acts of domestic violence against her. *See In re M.C.*, 374 N.C. 882, 889 (2020) (concluding that "respondent's refusal to acknowledge the effect of domestic violence on the children and her inability to sever her relationship with [the father], . . . supports the trial court's determination that the neglect of the children would likely be repeated if they were returned to respondent's care"); *see also In re M.A.*, 374 N.C. 865, 870 (2020) (holding that, even though the father claimed to have made reasonable progress toward satisfying the requirements of his case plan, the trial court's findings relating to his failure to adequately address the issue of domestic violence, which had been the primary reason for the children's removal from the family home, sufficed, "standing alone, . . . to support a determination that there was a likelihood of future neglect"); *In re J.A.M.*, 259 N.C. App. 810, 816 (2018) (holding that, where domestic violence was one of the grounds for the child's removal from the parental home, the mother's denial that she needed help and her continued involvement with the father,

who had committed acts of domestic violence against her, "constitute[d] evidence that the trial court could find was predictive of future neglect"). As a result, the trial court did not err by determining that there was a likelihood that the neglect that Arty had previously experienced would be repeated in the event that he was returned to respondent-mother's care and by concluding that respondent-mother's parental rights in Arty were subject to termination based upon neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 35 A trial court's determination that a parent's parental rights in a child are subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) is sufficient, in and of itself, to support the termination of that parent's parental rights. *In re E.H.P.*, 372 N.C. at 395. For that reason, we need not determine whether the trial court erred by determining that respondent-mother's parental rights in Arty were subject to termination for willful failure to make reasonable progress toward correcting the conditions that had led to Arty's placement in DSS custody, N.C.G.S. § 7B-1111(a)(2), or dependency, N.C.G.S. § 7B-1111(a)(6). In addition, we note that respondent-mother has not challenged the lawfulness of the trial court's determination that the termination of her parental rights would be in Arty's best interests. *See* N.C.G.S. § 7B-1110(a). As a result, for all of these reasons, we affirm the trial court's orders terminating respondent-mother's parental rights in Arty.

AFFIRMED.